**In re TAMASHA TOWN AND COUNTRY CLUB, Bankrupt.**
**Don ROTHMAN, Trustee, Appellant,**
v.
**UNITED STATES of America, Appellee.**
**No. 71–1634.**

United States Court of Appeals, Ninth Circuit.
Aug. 30, 1973.

Ralph E. Schub (argued), Sulmeyer, Kupetz & Alberts, Los Angeles, Cal., for appellant.

Karl Schmeidler (argued), Johnnie M. Walters, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Robert L. Meyer, U. S. Atty., Alan H. Friedman, Asst. U. S. Atty., Los Angeles, Cal., Meyer T. Rothwacks, Crombie J. D. Garrett, William S. Estabrook, III, Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before ELY and HUFSTEDLER, Circuit Judges, and TURRENTINE, District Judge.[*]

## OPINION

HUFSTEDLER, Circuit Judge:

On July 31, 1962, Tamasha Town and Country Club ("Tamasha") filed a petition for an arrangement under section 322, Chapter XI of the Bankruptcy Act ("Act"). (11 U.S.C. § 722.) Operations were continued under "debtor in possession" status. Tamasha's First Amended Plan of Arrangement was confirmed on January 21, 1965. In accordance with the plan of arrangement, $14,000 was deposited by Tamasha to pay the priority creditors, pursuant to section 337(2) of the Act. (11 U.S.C. § 737(2).) However, before any significant payments[1] were made from this fund,[2] the ailing company succumbed altogether and was adjudicated bankrupt on November 4, 1965.[3] The trustee then transferred the unpaid deposits to the trustee's account.

On January 27, 1970, the United States filed a priority claim of $6,774.09 and a claim of $7,603 as an expense of administration. Both claims represent accrued and unpaid taxes. With respect to the priority claim, $5,328.95 is pre-Chapter XI debt, tax obligations which arose before the filing of the petition for an arrangement. The remaining $9,048.14[4] is post-Chapter XI debt, tax obligations which accrued after the filing of the petition and during the now aborted plan of arrangement period. The referee required the trustee to satisfy the priority tax claim ($6,774.09) prior to any other distribution and allowed the expense of administration

---

[*] Southern District of California sitting by designation.

1. $263.20 was expended for court reporter fees, bond payment, and bookkeeping costs.

2. Suggestions of negligence were not pressed, and no evidence was presented to support a claim of wrongdoing or culpability

of the disbursing agent for not having expended the total fund.

3. For reasons not relevant here, the first order adjudicating Tamasha a bankrupt was vacated and an identical order was entered September 28, 1966.

4. $1,445.14 from the priority claim, plus the $7,603 expense of administration.

claim ($7,603) to share pro rata with other such claims.[5]

The trustee does not dispute the ruling on the expense of administration claim. He argues, however, that $1,445.-14 of the priority claim (the post-Chapter XI filing portion) should also be treated as an expense of administration and that the remaining $5,328.95 (pre-Chapter XI debt) should not be given a superpriority, but should be treated in accordance with section 64(a) of the Act. (11 U.S.C. § 104(a).) Claims for taxes accrued before the Chapter XI filing are given a fourth priority under section 64(a), well behind costs and expenses of administration. We hold that segregation of funds under a plan of arrangement, absent actual transfer, does not establish priorities that survive an adjudication of bankruptcy.

The trust fund theory advanced by the Government here is similar to that rejected in United States v. Randall (1971) 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273. In Randall, the Government's general trust fund theory was bolstered by reference to the explicit trust created by the Internal Revenue Code (26 U.S.C. § 7501(a)). The Court held that the Bankruptcy Act is "an overriding statement of federal policy on this question of priorities" and made reference to "the strong policy of § 64(a)(1) of the Bankruptcy Act." (401 U.S. at 515, 517, 91 S.Ct. at 992, 994; see also Nicholas v. United States (1966) 384 U.S. 678, 691, 86 S.Ct. 1674, 1683, 16 L.Ed.2d 853.) The opinion traced the history of legislative change which has continuously subordinated tax claims and elevated the priority of administrative costs and expenses, concluding "We think the statutory policy of subordinating taxes to costs and expenses of administration would not be served by creating or enforcing trusts which eat up an estate, leaving little or nothing for creditors and court officers whose goods and services created the assets." (401 U.S. at 517, 91 S.Ct. at 994.) The rationale and holding in Randall compel reversal here.

The Government would distinguish Randall on three bases: (1) Randall involved the interplay of two federal acts, while the instant case involves only the Bankruptcy Act; (2) in Randall no fund for taxes was actually segregated; and (3) the plan of arrangement in the instant case aborted after judicial confirmation, and therefore after the parties' rights had vested. None of these factors is determinative.

The trust asserted in Randall was that specifically created by 26 U.S.C. § 7501(a).[6] Here the Government asks us to enforce an implied trust, said to be found in the nexus of sections 337(2) and 367(2) of the Bankruptcy Act.[7] However, the Randall rule depends on the effect of the trust claimed, and not on its alleged source. We will not create or enforce an implied trust which would accomplish a reversal of the congressional policy favoring administration expenses over tax claims as fully as would the express trust in Randall. Nor does

---

5. All administrative expenses of the superseded arrangement period are subordinated to the administrative expenses of the ensuing bankruptcy proceeding. (See United States v. Randall (1971) 401 U.S. 513, 516, 91 S.Ct. 991; 9 Collier, Bankruptcy 519; 3A Collier, Bankruptcy 2109 (14th ed. 1972).

6. Section 7501(a) provides:
   "Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose."

7. The Randall Court referred not only to the overriding policy of the Bankruptcy Act, but also to the "strong policy" of § 64(a) (401 U.S. at 517, 91 S.Ct. 991), which is generally thought to possess the attraction of being the repository for all ordering of priorities in bankruptcy. (3A Collier, Bankruptcy 2074, 2153 (14th ed. 1972).)

the *Randall* rule depend upon isolation of particular funds. In *Randall,* the trustee argued that since the debtor in possession had failed to segregate the taxes withheld, no trust in favor of the United States resulted. (401 U.S. at 515, 91 S.Ct. 991.) Instead of adopting this argument, the Court chose to place its ruling on the survey of legislative developments favoring administrative expenses over tax claims and on the overriding policy of section 64(a), as discussed above.

Finally, nothing is added to the Government's case by its assertion that the parties' rights "vest" upon confirmation of the plan of arrangement. Such a characterization merely restates the issue presented here. Normally, confirmation of a plan does not freeze the rights of the parties.[8] Indeed, section 377(2) of the Act (11 U.S.C. § 777(2)) provides that even after confirmation the court may adjudge the debtor in default and subject to bankruptcy proceedings.[9] The parties cannot bind the ensuing bankruptcy court and avoid the statutory provisions of section 64(a) by their agreements under a plan of arrangement made at the very moment it becomes apparent that the future of the debtor is, at best, uncertain.[10] The rule of this circuit is that where a debtor operating under a plan of arrangement is adjudicated bankrupt, the adjudication relates back to the filing of the original Chapter XI arrangement petition. (*E. g.,* Miller v. Woolley (9th Cir. 1940) 141 F.2d 837, 841.) Any other rule would penalize the debtor attempting to redeem itself under a supervised plan of arrangement vis-a-vis the debtor proceeding directly to bankruptcy.[11] No such result is contemplated by the Act or permitted by *Randall.*

Thus, none of the distinctions pressed by the Government persuade us to resurrect the sort of trust fund theories interred by *Randall.* This holding promotes the policy objective of preserving section 64(a) as an integrated system allocating priorities in bankruptcy. Refusing to create superpriorities also furthers the goal of sound administration in bankruptcy by continuing to insure the primacy of the costs and expenses necessary to liquidate, administer, and close the estate in bankruptcy. When the Chapter XI arrangement collapsed, accrued but unpaid taxes became subject to the priorities specified in section 64(a). The referee erred in permitting

---

**8.** *Cf.* 9 Collier, Bankruptcy 531 (14th ed. 1972):

"Where a debtor defaults in carrying out the terms of his arrangement (after confirmation) but before the deposit made pursuant to § 337(2) has been disbursed, the money is forfeited and automatically becomes an asset of the bankrupt estate, at least where it was deposited by the debtor himself, rather than by a third party in his behalf [footnote omitted]."

**9.** This is identical to the options open to the court prior to confirmation. 11 U.S.C. § 776(2).

**10.** This does not mean that the arrangement is void *ab initio,* but simply that it is superseded. While it lasts, it is certainly binding. Gerson v. Booth Lumber Co. (9th Cir. 1955) 230 F.2d 631.

**11.** *Cf.* In re Setzler (S.D.Cal.1947) 73 F. Supp. 314, 316–317:

"It is my opinion, however, that the obligation of a debtor to make payments according to a plan continues only during the life of the arrangement, and ipso facto terminates upon dismissal of the arrangement proceedings pursuant to § 3FF(1) . . . . To hold otherwise would defeat the plain intendment of Chapter XI . . . . The bankruptcy law would advance a strange policy indeed if a debtor, who attempts to rehabilitate himself financially and benefit his creditors through an arrangement but fails, may be left saddled with debts upon discharge in bankruptcy, while a petitioner who seeks an immediate adjudication without undertaking a plan of arrangement goes debt free upon discharge. See Local Loan Co. v. Hunt, supra, 292 U.S. 234 at 244–245, 54 S.Ct. 695, 78 L.Ed. 1230, 93 A.L.R. 195."

*See also* Wood v. Scott (6th Cir. 1950) 180 F.2d 252, 253:

"[T]he obligation of the debtor to make payments under the arrangement continued only during its existence and terminated upon discontinuance of the arrangement proceedings under § 377 of the Bankruptcy Act [citations omitted]."

a priority tax claim of $6,774.09. Of this amount, $1,445.14 constitutes an expense of administration for the superseded arrangement period. The remaining $5,328.95 is pre-Chapter XI tax debt, and, as such, is to be accorded a fourth priority under section 64(a).

Reversed.

TURRENTINE, District Judge (dissenting):

I respectfully dissent.

The majority, in reversing the Court below, relies upon United States v. Randall, 401 U.S. 513, 91 S.Ct. 991, 28 L. Ed.2d 273 (1971), which involved conflicting sections of the Internal Revenue Code [1] and the Bankruptcy Act [2] competing for the same fund.[3]

The Court held that because Congress did not so intend, § 7501(a) does not create a trust for taxes withheld during an arrangement proceeding. The Court did not hold that a fund deposited pursuant to § 337 of the Act (11 U.S.C. § 737) was to be disbursed, after confirmation, in accordance with § 64(a) rather than § 367(2) of the Act [4] (11 U.S.C. § 767(2).) Moreover, it was not held

that no trusts in bankruptcy were to be created or enforced.

Of course, we are guided by the reasoning of the Supreme Court as well as its holding. Underlying the *Randall* Court's application of the statutory policy of subordinating taxes to the costs and expenses of administration was the premise that to enforce the statutory trust under the facts of *Randall* would "eat up" the estate created by creditors and court officers.[5] The fund here, though, is a § 337 deposit for the payment of *all* priority creditors as distinguished from the accounts created in *Randall*. In the ordinary case,[6] the fund deposited pursuant to § 337 of the Act is not derived from the bankrupt's estate and is not created by the creditors entitled to priority under § 64(a)(1), (2), (3).[7]

Under the facts of this case, neither the holding of *Randall*, nor the Court's reason for invoking the statutory policy is applicable.

In the absence of contrary authority to be found in the statutes or cases, I would give effect to the mandatory language of § 367(2) of the Bankruptcy Act, and the orders of the Referee in Bankruptcy by imposing a constructive

---

1. 26 U.S.C. § 7501(a).

2. Bankruptcy Act § 64(a), 11 U.S.C. § 104(a).

3. Pursuant to his powers, the referee ordered the debtor to establish three accounts and to make payments from them. I infer that a plan of arrangement was not confirmed since this order was entered two days after the petition was filed. Had a plan been confirmed, such procedure would have been contained in the plan.

4. The sole authority on this point is 9 Collier On Bankruptcy ¶ 10.13 at 531 (14th ed. 1972), cited by the majority at note 8 for another proposition. *Collier*, however, cites to In re Portage Wholesale Co., 187 F.2d 387 (7th Cir. 1951), aff'g, 88 F.Supp. 3 (W.D.Wis.1950), wherein the district court's opinion recites that the deposit was to indemnify the bankrupt estate rather than to be disbursed to creditors upon confirmation.

5. The fund in *Randall* was generated from the operation of the business by the debtor in possession.

6. It may be said in the ordinary case that the problem here does not arise because the deposit will have been disbursed by the time of termination. 9 Collier On Bankruptcy ¶ 10.12 [4.2] (14th ed. 1972).

7. [T]he assets of the estate cannot be used to make the deposit, unless so authorized by the court. Payments made to the distributees of the deposit are not payments of a share of the debtor's estate to which the distributees are entitled, but are payments of their share of the deposit fund which the debtor must provide in accordance with the provisions of the Act and his arrangement. 8 Collier On Bankruptcy § 5.36 at 742 (14th ed. 1972).

   In the case before the Court the referee found that the source of the deposit was unknown. Apparently no order was issued authorizing funds of the estate for the deposit. See 10 Collier On Bankruptcy, Form Nos. 3108, 3109 (14th ed. 1972) for form of such order.

trust upon the fund to the extent that it should have been disbursed prior to the termination of the arrangement.[8] This result avoids a strained construction of *Randall* and comports with the equitable nature of a Court of Bankruptcy.[9]

8. The majority's refusal to "freeze" the rights of the creditors according to the terminated plan is simply gratuitous. No one argues that the plan remains in effect upon adjudication. In re Setzler, 73 F.Supp. 314 (S.D.Cal.1947), is a correct statement of the law. A debtor is entitled to be discharged from payments in default under a plan where the failure was unintentional and resulted from inability to comply.

9. *See* Securities Comm'n v. U. S. Realty Co., 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).